1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                   **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8

9  LEXINGTON INSURANCE                    CASE NO. CV F 08-1539 LJO GSA
   COMPANY,
10                                        **SUMMARY JUDGMENT DECISION**
                       Plaintiff,         _____(Doc. 16.)
11         vs.

12  SENTRY SELECT INSURANCE
    COMPANY,
13
                       Defendant.
14  _____/

15                         **INTRODUCTION**

16  _____Defendant primary insurer Sentry Select Insurance Company ("Sentry") seeks summary

17  judgment/adjudication on plaintiff excess insurer Lexington Insurance Company's ("Lexington's")

18  equitable subrogation, equitable indemnity and declaratory relief claims arising from settlement of an

19  underlying vehicle death and related action.  Lexington responds that the underlying release upon which

20  Sentry relies is limited to the underlying action and inapplicable to its claims, which Sentry fails to

21  defect.  This Court considered Sentry's summary judgment/adjudication motion on the record[1] and

22  VACATES the June 11, 2009 hearing, pursuant to Local Rule 78-230(h).  For the reasons discussed

23  _____

24         [1]      This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony,
    statements of undisputed facts and responses thereto, objections and other papers filed by the parties.  Omission of reference
25  to an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the argument,
    document, objection or paper.  This Court thoroughly reviewed, considered and applied the evidence it deemed admissible,
26  material and appropriate for summary judgment/adjudication.  This Court does not rule on objections in a summary
    judgment/adjudication context.

27         In addition, Sentry's reply brief exceeds the 10-page limit set by this Court's standing order.  As ordered below,
    Sentry is required to show cause why this Court should not sanction Sentry for exceeding the reply brief page limit.
28

                                    1

below, this Court DENIES Sentry summary judgment and DENIES as moot Lexington's F.R.Civ.P. 56(f) request.

## BACKGROUND

### The Primary And Excess Policies

Sentry issued to Bear Trucking, Inc. ("Bear Trucking") a primary commercial liability policy ("Sentry policy") with a $1 million limit of liability for commercial automobile liability coverage. Lexington issued to Bear Trucking a stand alone excess liability policy ("Lexington policy") with a $4 million per occurrence limit in excess of the Sentry policy's $1 million retained amount for automobile liability.

### The Underlying *Moran* Action Trial

During the early morning of July 12, 2005, Bear Trucking employee Robert Knieling ("Mr. Knieling") parked his long-haul tractor and trailer in an "Emergency Parking Only" portion of a California highway in Ventura County. Erquimedes Moran ("Mr. Moran") drove a utility truck, swerved off the highway and collided with the rear of Mr. Knieling's trailer to cause personal injuries to Mr. Moran and fatal injuries to Daniel Torres ("Mr. Torres"), Mr. Moran's passenger.

Mr. Moran, Jacqueline Torres, Mr. Torres' widow, and Concepcion Torres, Mr. Torres' mother, pursued an underlying Ventura County Superior Court action ("*Moran* action") against Bear Trucking and Mr. Knieling. Sentry defended Bear Trucking and Mr. Knieling in the *Moran* action and funded a combined $67,000 settlement of Mr. Moran and Concepcion Torres' claims and workers' compensation liens prior to trial.

Jacqueline Torres pursued her wrongful death claim to an April 2007 trial which resulted in a $7 million verdict, assessing 80 percent liability against Bear Trucking and Mr. Knieling for a $5.6 million net verdict. On July 9, 2007, the trial court conditionally granted Bear Trucking and Mr. Knieling's motion for a new trial unless Jacqueline Torres accepted a remittitur to $2.6 million. The trial court found error in apportionment of more than 50 percent fault to Bear Trucking and Mr. Knieling in the absence of evidence that Bear Trucking and Mr. Knieling were more culpable than Mr. Moran. On July 13, 2007, Jacqueline Torres accepted the remittitur.

On August 7, 2007, defense counsel for Bear Trucking and Mr. Knieling appealed. On August

2

9, 2007, Jacqueline Torres cross-appealed the conditional order granting new trial.  Lexington paid a $10,325.40 premium toward an appeal bond.

### Sentry's Tender To Lexington And Lexington's Reservation Of Rights

During a July 13, 2007 telephone conversation, Sentry claims examiner Gary Hoffman ("Mr. Hoffman") informed Lexington excess claims examiner Andrea Palmstrom ("Ms. Palmstrom") that Sentry tendered its remaining policy limits to Lexington.  Lexington coverage counsel James Wagoner ("Mr. Wagoner") sent Mr. Hoffman a July 25, 2007 letter to claim that Sentry had breached duties to Lexington to "immediately send us copies of demands, notices, summons or other legal papers received in connection with the claim or suit" and to "cooperate with us in the investigation, settlement or defense of the claim or suit."  Mr. Wagoner further claimed that Sentry had breached its duty of good faith and fair dealing to its insureds and, in turn, to Lexington to settle within the Sentry policy's $1 million limits and that Sentry was liable for the entire judgment against Bear Trucking and Mr. Knieling.  The letter concluded:

> Accordingly, Lexington hereby demands that Sentry fully indemnify its insureds for the entire judgment, regardless of the outcome of any appeals or cross-appeals.  In the event that Sentry chooses to appeal, Lexington specifically demands that Sentry be responsible in full for the bond or other security on appeal.

Sentry coverage counsel Neil Selman ("Mr. Selman") responded to Mr. Wagoner with a July 31, 2007 letter that Sentry had complied with "any purported notice and cooperation clauses in Lexington's policy," that Sentry did not unreasonably fail to settle within policy limits, and that it owed no direct duties to Lexington to do so.  Mr. Selman recommended that Lexington "protect our mutual insured's interests and resolve this case."  Mr. Selman noted that "Sentry is willing to pay it remaining limit, which is now $933,000, towards such a resolution."  Mr. Selman further noted that Sentry "will bond its share of the judgment based upon its remaining policy limits.  Sentry demands that Lexington bond the remaining amount."  Mr. Selman suggested a conference call "to discuss each carriers respective share of the costs of the bond, and how to ensure that the insured is properly protected."  The letter indicates  that James Greaney ("Mr. Greaney"), Bear Trucking's operations and safety director, was a cc recipient of the letter.

Mr. Wagoner, Lexington coverage counsel Meka Moore ("Ms. Moore") and Sentry's Dan

Jurgella participated in an August 6, 2007 conference call. Ms. Moore followed up the call with her August 6, 2007 email to note that Sentry and Lexington "agreed that each carrier would post its respective share of the bond in the underlying matter. We understand that Lexington will be doing so under a reservation of rights, and that Lexington does not intend to waive any rights that it may have at this time." Ms. Moore further noted that despite an expected notice of appeal in the *Moran* action, "this may be the appropriate time to resolve the underlying matter, and Sentry certainly encourages Lexington to do so. In this vein, Sentry tenders its remaining policy limit of $933,000 to Lexington to resolve the case."

In his declaration, Mr. Wagoner notes that "Ms. Moore agreed to the reservation of rights agreement and said Sentry reserved its rights as well." Mr. Wagoner's August 7, 2007 email confirmed the agreement "that there would be a reservation of rights agreement between Sentry and Lexington by which each insurer will reserve rights against the other . . . to preserve all claims between the insurers while Sentry pursues an appeal on behalf of the insured." Ms. Moore responded by email: "Agree that was the understanding – ROR was mutual."

A November 19, 2007 mediation was set for the *Moran* action. Mr. Wagoner's September 14, 2007 letter to Ms. Moore noted that since Sentry rejected "a mediation in which Sentry and Lexington could also mediate their differences over the verdict and Sentry's failure to settle the claim within its limits[,] . . . Sentry should be responsible for the full cost of the mediation." Mr. Wagoner further noted that "Lexington's participation in this case is pursuant to full reservation of rights, a position which your clients have previously acknowledged and agreed to formalize by way of a reservation of rights agreement."

**Reservation Of Rights Agreement**

Sentry and Lexington entered into an October 31, 2007 Reservation of Rights Agreement ("ROR agreement") which provides in pertinent part:

> Lexington has made demand upon Sentry to fully indemnify Bear Trucking and Robert Knieling for the entirety of the judgment in the Moran v. Knieling action and to be fully responsible for any bond on appeal. Sentry has rejected that demand. Sentry has tendered its remaining policy limits to Lexington and asked that Lexington work toward settling the underlying action.
>
> The purpose of this agreement is to permit Sentry and Lexington to jointly post an

4

appropriate bond or other security on appeal with respect to the <u>Moran v. Knieling</u> action while each reserves all rights against the other with respect to their respective responsibilities for the judgment entered in <u>Moran v. Knieling</u>, including any Judgment which may be entered subsequent to the conclusion of the appellate proceedings by way of retrial or otherwise.

. . .

By entering into this agreement or undertaking any other conduct in connection with the <u>Moran v. Knieling</u> action, including but not limited to, the appeal, neither Party to this agreement waives, relinquishes, releases, discharges or otherwise gives up any right or claim of right which either party has against the other.  In particular, Lexington does not in any way waive, relinquish, release or discharge its right to claim that Sentry is liable for the full amount of the Judgment in the <u>Moran v. Knieling</u> action, the full amount of the cost of the bond in the <u>Moran v. Knieling</u> action and full amount of any Judgment entered or to be entered in the <u>Moran v. Knieling</u> action upon retrial or otherwise.

Mr. Wagoner's November 14, 2007 letter to Ms. Moore asserted that Sentry is solely responsible for prejudgment interest in the *Moran* action in that it represents a "cost" for which Sentry is obligated under the Sentry policy's supplementary payments provision to render it liable for "all costs taxed against the insured in the suit."

The November 19, 2007 mediation of the *Moran* action proceeded but did not result in settlement.[2]  In his December 6, 2007 letter to Mr. Wagoner, Sentry coverage counsel Mr. Selman noted that "Sentry offered plaintiff its remaining policy limit of $933,000 which was rejected."  The letter further noted the mediator's "comments that plaintiff has some interest in continued negotiations below the amount of the remitted judgment.  Accordingly, Sentry again tenders its remaining limit to Lexington, as it has done since July 13, 2007, and demands that Lexington resolve this matter."  Mr. Selman addressed Lexington's potential claims:

If Lexington has a claim it wants to pursue against Sentry, Lexington should instruct Sentry to make its money available, something Sentry has clearly stated it is willing to do, and use its policy proceeds to settle this claim now.  Once this risk is contained, Lexington can then pursue Sentry for reimbursement of the funds Lexington put up, should Lexington decide it wants to pursue such a frivolous claim.  By not doing so, Lexington assumes the risks of its behavior.

---

[2]       Lexington excess manager Donna Doyle attended the mediation and in her declaration states: "Nobody at the mediation communicated to me that Sentry's tender of its remaining policy limits was contingent upon Lexington consenting to waive its subrogation rights against Sentry based upon Lexington's claim that Sentry unreasonably failed to settle within policy limits prior to the judgment in the *Moran* Action, and thus is liable to indemnify the insured for any amounts in excess of Sentry's limits."

5

1  The letter indicates that Bear Trucking's Mr. Greaney was a cc recipient.

2  **Settlement Of The *Moran* Action And Release**

3  When the appeal was pending and after further efforts following mediation, a $2.25 million

4  settlement was reached for the *Moran* action in February 2008.  Mr. Wagoner's February 28, 2008 letter

5  to Mr. Selman and Ms. Moore noted that the settlement involves "a release of the defendants.

6  Lexington's commitment to fund its share of the settlement is under full and complete reservation of all

7  of its rights against Sentry."  Mr. Wagoner further noted that Lexington will file "shortly" an action

8  against Sentry.

9  Mr. Wagoner's March 4, 2008 letter to Mr. Selman and Ms. Moore explained that "Lexington

10  cannot make out its check until it is informed as to the amount which Sentry believes is owed (subject

11  to reservation of rights)."  Ms. Moore's March 5, 2007 letter to Mr. Wagoner noted that "Sentry will

12  instruct its defense counsel Robert Bruce Salley to prepare the proper closing documents which should

13  include a release agreement **on behalf of all defendants,** dismissal and/or Satisfaction of Judgment."

14  (Bold added.)

15  For the settlement, Sentry paid $1,034,968.20 (its remaining limits plus costs) pursuant to the

16  Sentry policy.  Lexington paid $1,215,031.80 pursuant to the Lexington policy and under reservation

17  of rights.  The appeal and cross-appeal were dismissed with prejudice.

18  Bear Trucking, Mr. Knieling and Jacqueline Torres executed a March 13, 2008 Settlement

19  Agreement and Release of All Claims ("release"), which was prepared by Sentry defense counsel Robert

20  Salley ("Mr. Salley") and which states in pertinent part:

21  FOR THE CONSIDERATION DESCRIBED HEREIN, we being of lawful age,
do hereby mutually release, acquit and forever discharge: BEAR TRUCKING, INC.,

22  SENTRY SELECT INSURANCE COMPANY, LEXINGTON INSURANCE
COMPANY, all of these companies' respective owners, principles, officers, directors,

23  employees, and agents, ROBERT D. KNIELING, JACQUELINE TORRES and all of
their respective attorneys, hereinafter designated as the "Releasees" of and from any and

24  all actions, causes of action, claims, demands, damages, costs, loss of services, expenses,
attorneys' fees and compensation, on account of, or in any way growing out of, any and

25  all known and unknown personal injuries, damages, fees and costs resulting or to result
from or by reason of any acts or omissions on the part of Releasees occurring at any time

26  prior hereto, the facts of which are more particularly set forth in that certain action filed
in the Ventura Superior Court entitled <u>ERQUIMEDES MORAN, JACQUELINE</u>

27  <u>CALDERON TORRES AND CONCEPCION GUEVARA TORRES vs. ROBERT</u>
<u>KNIELING, BEAR TRUCKING, INC., et al.</u>, being Case No. SC044726, and the appeal

28  and cross-appeal therein.  (Uppercase and underling in original.)

1    The release includes a California Civil Code section 1542 waiver, which provides:

2         It is understood and agreed that all rights under Section 1542 of the California
3    Civil Code are hereby expressly waived.  Civil Code, §1542 provides as follows:
     "CERTAIN CLAIMS NOT AFFECTED BY GENERAL RELEASE – A general release
4    does not extend to claims which the creditor does not know or suspect to exist in his
     favor at the time of executing the release, which if known by him must have materially
5    affected his settlement with the debtor.  (Uppercase and underling in original.)

6    Lexington notes that the release was prepared without its or Bear Trucking's "input or

7    involvement" and lacks language that Bear Trucking or Mr. Knieling warrants that either has authority

8    to release claims against Sentry.  Lexington points out that Sentry did not request Lexington's input or

9    approval of the release.

10       With his March 12, 2008 letters, Mr. Salley forwarded the release to Bear Trucking and Mr.

11   Knieling for signature.  Mr. Salley's letters state:

12   This confirms that Sentry Select Insurance Company and Lexington Insurance Co., have
     negotiated a $2.25 million settlement with Plaintiff, Jacqueline Torres.  In order to
13   complete this settlement, it has been requested that all parties execute a Release of
     Claims.  Pursuant to the Release, all claims of any party, including you, are relinquished,
14   against any other party or any insurance company.

15   Should you wish to discuss the effect of this Release, you can contact this office and/or
     speak to any counsel you wish to privately retain.
16

17   Assuming that it meets with your approval, it is requested that you execute the enclosed
     Release of Claims where indicated and return same to this office as quickly as is
18   possible.

19       Lexington notes that it did not receive copies of the letters to Bear Trucking and/or Mr. Knieling

20   regarding signing the release.  Lexington excess claims examiner Ms. Palmstrom declares that

21   "Lexington has never given its consent to its insured, Bear Trucking, to give a release to Sentry of

22   Lexington's subrogation rights."

23       Sentry notes that Bear Trucking agreed with Sentry's handling of the *Moran* action and

24   settlement.  Mr. Greaney, Bear Trucking's operations and safety director up to December 2007, states

25   in his declaration: "Bear Trucking agreed with SENTRY SELECT's decision to proceed to trial against

26   Jacqueline Torres, appeal the verdict entered in that case, and then offer its policy limits toward

27   ultimately settling the case."  Mr. Greaney describes himself as "an authorized representative and

28   primary contact person for Bear Trucking" in defense of the *Moran* action and notes that he "handled

7

1   the day-to-day matters" of the *Moran* action defense.

2       Bear Trucking general manager Sonny Woodall ("Mr. Woodall") was also involved in the *Moran*

3   action, its settlement and the release and declares: "In the Moran Action, Bear Trucking agreed with

4   SENTRY SELECT's decision to proceed to trial, appeal the verdict, and ultimately settle the case."

5                              **Lexington's Claims**

6       Lexington's operative first amended complaint ("FAC") alleges that in defending Bear Trucking

7   and Mr. Knieling, Sentry acted in bad faith "in seeking to protect solely its own interests" by, among

8   other things, failing to: (1) accept reasonable settlement offers within Sentry's limits; (2) attempt to

9   reach a reasonable settlement; and (3) inform Lexington of Sentry's investigation, settlement demands

10  and trial progress.  The FAC alleges (first) equitable subrogation and (second) equitable indemnity

11  causes of action that Sentry is liable for Lexington's contributions of $1,215,031.80 for settlement,

12  $137,485.90 for prejudgment interest, $10,325.40 for appeal bond premium, and $2,137.50 for

13  mediation costs ($1,364,980.60 total).  The FAC alleges a (third) declaratory relief cause of action that

14  Sentry is responsible for "the entire amount of the judgment" and "the entire cost of the mediation and

15  is required to indemnify Lexington for costs incurred with respect to the mediation."

16                              **DISCUSSION**

17                      **Summary Judgment/Adjudication Standards**

18      Sentry seeks summary judgment/adjudication that equitable indemnity is unavailable to

19  Lexington, that the release bars equitable subrogation, and in turn, declaratory relief fails.

20      F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on

21  all or part of the claim."  Summary judgment/adjudication is appropriate when there exists no genuine

22  issue as to any material fact and the moving party is entitled to judgment/adjudication as a matter of law.

23  F.R.Civ.P. 56(c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348,

24  1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

25  The purpose of summary judgment/adjudication is to "pierce the pleadings and assess the proof in order

26  to see whether there is a genuine need for trial."  *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct.

27  1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

28      On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to

                                        8

any material fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment/adjudication is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment/adjudication, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact."  *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."  *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of

1  summary judgment, after adequate time for discovery and upon motion, against a party who fails to make

2  the showing sufficient to establish the existence of an element essential to that party's case, and on

3  which that party will bear the burden of proof at trial.")

4       "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

5  the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

6  106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough

7  'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Aydin Corp.*

8  *v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-

9  289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the

10 plaintiff's position will be insufficient."  *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

11      Under F.R.Civ.P. 56(d)(1), a summary judgment/adjudication motion, interlocutory in character,

12 may be rendered on the issue of liability alone.  "In cases that involve . . . multiple causes of action,

13 summary judgment may be proper as to some causes of action but not as to others, or as to some issues

14 but not as to others, or as to some parties, but not as to others." *Barker v. Norman*, 651 F.2d 1107, 1123

15 (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v.*

16 *Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989).  A court "may grant

17 summary adjudication as to specific issues if it will narrow the issues for trial." *First Nat'l Ins. Co. v.*

18 *F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal. 1977).

19      As discussed above, Lexington raises genuine issues of material fact, and Sentry fails to negate

20 elements of Lexington's claims, to demonstrate that Lexington lacks evidence to support elements of

21 its claims or that Sentry is entitled to judgment as a matter of law.

22                              **Equitable Subrogation**

23      Sentry contends that Lexington is unable to establish elements of its (first) equitable subrogation

24 cause of action.

25      In the insurance context, "subrogation takes the form of an insurer's right to be put in the position

26 of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss

27 which the insurer has both insured and paid." *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65

28 Cal.App.4th 1279, 1291-1292, 77 Cal.Rptr.2d 296 (1998).  The California Court of Appeal has further

explained:

> The right of subrogation is purely derivative. An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured. The subrogated insurer is said to " 'stand in the shoes' " of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have.

*Fireman's Fund*, 65 Cal.App.4th at 1292, 77 Cal.Rptr.2d 296.

The essential elements of an insurer's equitable subrogation cause of action are:

1.   The "insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer";

2.   The "claimed loss was one for which the insurer was *not* primarily liable";

3.   The "insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable";

4.   The "insurer has paid the claim of its insured to protect its own interest and not as a volunteer";

5.   The "insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer";

6.   The "insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends";

7.   "[J]ustice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer"; and

8.   The "insurer's damages are in a liquidated sum, generally the amount paid to the insured."

*Fireman's Fund*, 65 Cal.App.4th at 1292, 77 Cal.Rptr.2d 296.

### *Assignable Cause Of Action – Release*

Sentry argues that Lexington lacks an "existing, assignable cause of action" against Sentry in that Bear Trucking and Mr. Knieling "released all of their claims against Sentry."

In *Fireman's Fund Ins. Co. v. Maryland Casualty Co.*, 21 Cal.App.4th 1586, 1596-1597, 26 Cal.Rptr.2d 762 (1994) ("*Fireman's Fund 1994*"), the California Court of Appeal explained:

> Since the subrogated insurer stands in the shoes of its insured, the insurer has no greater rights against the third party than did the insured . . . and is subject to all defenses the third party could have asserted against the insured. . . . Thus, when an insured has released a third party, neither the insured nor the subrogated insurer has any rights to recover from the third party.

Sentry notes that Lexington stands in Bear Trucking and Mr. Knieling's shoes to recover for alleged insurance bad faith "via equitable subrogation, but Bear Trucking and Mr. Knieling fully released that claim and all other claims against Sentry."

Pursuant to the release, Bear Trucking and Robert Knieling agreed to "release, acquit and forever discharge" Sentry "of and from any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses, attorneys' fees and compensation, on account of, or in any way growing out of, any and all known and unknown personal injuries, damages, fees and costs, resulting or to result from or by reason of any acts or omissions on the part of [Sentry] occurring at any time prior hereto, the facts of which are more particularly set forth . . ." in the *Moran* action. Sentry argues that the release "is not limited to the 'facts' of the *Moran* Action, but rather includes claims "on account of, or in any way growing out of" the *Moran* action."

Moreover, "when an insured agrees to an insurer's settlement of a third party claim, the insured waives any right to maintain a bad faith action against the insurer based on the settlement, unless the insured's agreement to the settlement was procured by coercion, duress, fraud or some other improper means." *United Services Auto. Ass'n v. Alaska Ins. Co.*, 94 Cal.App.4th 638, 646, 114 Cal.Rptr.2d 449 (2001). An implied waiver arises under circumstances which accord with the principle that "'California courts will find waiver when a . . . party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.'" *United Services*, 94 Cal.App.4th at 646, 114 Cal.Rptr.2d 449 (quoting *Waller v. Truck Ins. Exchange, Inc.,* 11 Cal.4th 1, 33-34, 44 Cal.Rptr.2d 370 (1995)). "Among the duties imposed on an insurer by the implied covenant of good faith and fair dealing are . . . duty to accept a reasonable settlement demand within policy limits." *Safeco Ins. Co. of America v. Parks*, 170 Cal.App.4th 992, 1006, 88 Cal.Rptr.3d 730 (2009). As such, Sentry contends that bad faith and failure to settle claims are waived to prevent Lexington to establish a

1    necessary element of equitable subrogation.

2        Lexington responds that Sentry applies the release too broadly in that "the release does not

3    extend to any claims based on 'facts' other than those 'more particularly set forth in' the *Moran* Action."

4    Lexington contends that the release's scope is limited to the facts relating to "the auto accident" at issue

5    in the *Moran* action, not "the 'facts' regarding Sentry's bad faith refusal to settle."

6        Lexington notes that a release "must be clear and explicit, free of ambiguity or obscurity, and tell

7    the prospective releasor he or she is releasing the other from liability, including negligence. The

8    language must be comprehensible." *Conservatorship of Link*, 158 Cal.App.3d 138, 143, 205 Cal.Rptr.

9    513 (1984). Generally, "a written release extinguishes any obligation covered by the release's terms,

10   provided it has not been obtained by fraud, deception, misrepresentation, duress or undue influence."

11   *Skrbina v. Fleming Companies, Inc.*, 45 Cal.App.4th 1353, 1366, 53 Cal.Rptr.2d 481  (1996).

12       A "release does not discharge nonparties unless the contracting parties so intend." *Westlye v.

13   Look Sports, Inc.*, 17 Cal.App.4th 1715, 1729, 22 Cal.Rptr.2d 781 (1993). A "third party's rights under

14   a release agreement are predicated upon the contracting parties' intent to benefit him and . . . the third

15   party bears the burden of showing that the contracting parties intended to release him." *Unova, Inc. v.

16   Acer, Inc.*, 363 F.3d 1278, 1281 (Fed. Cir. 2004) (applying California law). "In determining the meaning

17   of a written contract allegedly made, in part, for the benefit of a third party, evidence of the

18   circumstances and negotiations of the parties in making the contract is both relevant and admissible."

19   *Garcia v. Truck Ins. Exch.*, 36 Cal.3d 426, 682 P.2d 1100, 1105 (1984). "The circumstance that a literal

20   contract interpretation would result in a benefit to the third party is not enough to entitle that party to

21   demand enforcement." *Hess v. Ford Motor Co.*, 27 Cal.4th 516, 524, 117 Cal.Rptr.2d 220 (2002).

22       Lexington argues that Sentry, a non-party to the release, fails to demonstrate that the release

23   parties "intended to benefit Sentry by releasing it from Lexington's prospective and fully known bad

24   faith claim." Lexington notes that the mediator and Mr. Wagoner negotiated the settlement and that Mr.

25   Wagoner advised Sentry coverage counsel Mr. Selman and Ms. Moore that the settlement will involve

26   "a release of the defendants." Lexington further notes that Sentry defense counsel Mr. Salley's

27   preparation of the release to include Sentry adds nothing in that: "There is no magic in the mere

28   inclusion of the insurer's name in a release of uncertain parameters. That merely tells us the company

13

1   was released for the original claim, nothing more necessarily." *Vega v. Western Employers Ins. Co.,*

2   170 Cal.App.3d 922, 926, 216 Cal.Rptr. 592 (1985), disapproved on other grounds, *Moradi-Shalal v.*

3   *Fireman's Fund. Ins. Cos.*, 46 Cal.3d 287, 310-312, 250 Cal.Rptr. 116 (1988). Lexington contends that

4   the release did not intend to release Sentry of bad faith in that such a release extends beyond the subject

5   matter which gave rise to the claim payment.

6       Lexington continues that the release "was simply between adverse parties to a wrongful death

7   action." Lexington explains that Bear Trucking and Mr. Knieling had no "discernable motive" to release

8   Sentry from bad faith since Bear Trucking and Mr. Knieling "were not adverse to Sentry with respect

9   to the release" and in the absence of a dispute whether Sentry was obligated to indemnify Bear Trucking

10  and Mr. Knieling. Lexington attributes to Sentry a motive "to try to avoid Lexington's known claim for

11  breach of the implied covenant, a claim which Sentry also knew Lexington fully intended to assert."

12      At a minimum, Lexington has raised issues of material fact regarding the release and its intended

13  scope. Although the release refers to Sentry, the evidence is unclear whether Bear Trucking and Mr.

14  Knieling intended to release Sentry of bad faith. The release does not refer specifically to bad faith or

15  insurance handling matters to raise a question whether release of related claims was "comprehensible."

16  This Court disagrees that Bear Trucking "declared that it does not believe Sentry Select committed bad

17  faith" when Bear Trucking's Mr. Greaney and Mr. Woodall demonstrate at best limited expertise and

18  direct knowledge on the issue.

19      A further question arises whether the release is tethered or limited to the "facts" of the *Moran*

20  action. Sentry offers no meaningful evidence of the parties' intentions and relies on the cryptic

21  declarations of Mr. Greaney and Mr. Woodall that they were satisfied with Sentry's handling of the

22  *Moran* action. Sentry's argument that Mr. Greaney and Mr. Woodall's declarations clarify Bear

23  Trucking's intent is unavailing.

24      Another troubling matter is that Sentry was aware of Lexington's anticipated claims at the time

25  the release was signed. A question arises whether Sentry attempted to take advantage of the

26  circumstances to extract a defense to Lexington's well documented intent to pursue action against

27  Sentry. Although the current record fails to establish conclusively Sentry's fraud or otherwise wrongful

28  action, questions arise as to the inclusion of Sentry in the release, especially given that there "is no

1   magic" to include its name.  As such, Lexington has created factual issues regarding Sentry's attempt

2   to negate an essential element of Lexington's equitable subrogation claim.

3       In addition, Lexington raises material factual issues as to the release's ambiguity.  "An ambiguity

4   exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a

5   writing."  *Solis v. Kirkwood Resort Co.*, 94 Cal.App.4th 354, 360, 114 Cal.Rptr.2d 265 (2001).  When

6   "the language used is fairly susceptible to one of two constructions, extrinsic evidence may be

7   considered, not to vary or modify the terms of the agreement, but to aid the court in ascertaining the true

8   intent of the parties."  *Butler v. The Vons Companies, Inc.,* 140 Cal.App.4th 943, 949, 45 Cal.Rptr.3d

9   151 (2006).  An "ambiguity about the scope of a release should normally be construed against the

10  drafter, as with other contracts."  *Solis*, 94 Cal.App.4th at 360, 114 Cal.Rptr.2d 265.

11      Based on Sentry's interpretation of the release, material factual questions arise as to the release's

12  scope to subject the release to an ambiguity claim.  The release appears as a fairly standard release of

13  Jacqueline Torres' underlying claims against Bear Trucking and Mr. Knieling.  The release includes a

14  specific reference to the *Moran* action.  As noted above, the release lacks reference to insurance matters,

15  which easily could have been included.  An ambiguity of the release's scope is of Sentry's making since

16  its defense counsel Mr. Salley prepared it.  Based on the evidence construed in Lexington's favor,

17  factual issues arise as to the release's ambiguous scope to defeat summary judgment of Lexington's

18  equitable subrogation claim.

19                          ***Knowledge Of Subrogation Rights***

20      Lexington further argues that Sentry's knowledge of Lexington's subrogation rights precluded

21  Bear Trucking and Mr. Knieling to release its subrogation rights.  Lexington notes that Sentry, Bear

22  Trucking and Mr. Knieling knew that Lexington participated in the settlement process pursuant to the

23  ROR agreement.  Lexington concludes that "Sentry had full and complete knowledge of Lexington's

24  subrogation rights prior to any settlement of the *Moran* Action and that Lexington fully intended to

25  pursue this lawsuit against it" and that with its reservation of rights, "Lexington had preserved its

26  subrogation rights in a manner that precluded the insured from unilaterally impairing them."

27      Sentry responds that despite Lexington's reservation of rights, Lexington "could only reserve the

28  rights it actually had" and that "Lexington had no claim against Sentry when it insisted on reserving its

rights, and even if it did, those rights were extinguished when the insured signed the Release." Sentry

characterizes Lexington's "posturing before settlement" as "immaterial."

"The general rule of subrogation provides that an insurer stands in the shoes of its insured; if an

action by the insured is barred, so is the action of the insurer. . . . An exception to the rule exists in

California, however, where the tortfeasor settles with the insured with knowledge that the insured has

been indemnified by an insurer." *Griffin v. Calistro*, 229 Cal.App.3d 193, 196, 280 Cal.Rptr. 30 (1991).

The California Court of Appeal has further explained the exception:

> Ordinarily, it is the duty of the insurer to protect its right to subrogation by not
> permitting the splitting of a cause of action. (*Kidd v. Hillman* (1936) 14 Cal.App.2d 507,
> 510 [58 P.2d 662].) However, where the tortfeasor is aware of the insurer's subrogation
> claim and nonetheless chooses to settle the insured's claim independent from the insurer's
> claim, the tortfeasor may not invoke the rule against splitting a cause of action to
> foreclose a subsequent action by the insurer. (*Griffin v. Calistro*, supra, 229 Cal.App.3d
> at p. 196.) Thus, "'where the tortfeasor obtains a release from the insured with knowledge
> that the latter has already been indemnified by the insurer, such release of the tortfeasor
> does not bar the right of subrogation of the insurer.'" (*Conservatorship of Edwards*
> (1988) 198 Cal.App.3d 1176, 1184 [244 Cal.Rptr. 330], quoting 16 Couch on Insurance,
> *supra*, § 61:201, p. 262.) This is because such a settlement, effected with "knowledge,
> actual or constructive" of the insurer's subrogation rights constitutes a "fraud on the
> insurer[]." (16 Couch on Insurance, *supra*, § 61:201 at p. 265.) Under those
> circumstances, although another action by the insured would be barred, the insurer's
> cause of action is not barred. (*Conservatorship of Edwards, supra*, at p. 1184.)

*Allstate Ins. Co. v. Mel Rapton, Inc.*, 77 Cal.App.4th 901, 912, 92 Cal.Rptr.2d 151 (2000); *see also*

*Steigerwald v. Godwin*, 144 Cal.App.2d 591, 595, 301 P.2d 386 (1956) ("by subrogation the insurer

acquires all the rights of action of the insured and a release obtained with knowledge of subrogation

rights would not avail the tort feasor").

Lexington seeks to invoke the known subrogation rights exception.  The evidence demonstrates

that Sentry was aware of Lexington's claims as early as Mr. Wagoner's July 25, 2007 letter to Sentry

claims examiner Mr. Hoffman and that Lexington continued to assert its claims through the settlement

process, including the October 31, 2007 ROR agreement.  Sentry coverage counsel Mr. Selman's July

13, 2007 letter noted Lexington's potential claims and that "[o]nce this risk is contained, Lexington can

then pursue Sentry for reimbursement of the funds Lexington put up."  After the *Moran* action settlement

was reached, Mr. Wagoner's March 4, 2008 letter to Mr. Selman and Ms. Moore reiterated: "Lexington's

commitment to fund its share of the settlement is under full and complete reservation of all of its rights

against Sentry."  Lexington notes that it never provided to its insured Bear Trucking a release of

16

Lexington's subrogation rights and that Sentry acknowledges that Lexington paid its portion of the settlement under a reservation of rights.

Sentry occupies the position of a tortfeasor who settles with insureds, Bear Trucking and Mr. Knieling, with knowledge that the insureds had been indemnified by insurer Lexington. Sentry knew of Lexington's subrogation claim and choose to "settle" with Bear Trucking and Mr. Knieling and obtain a release from them. Barring Lexington's subrogation rights would constitute a fraud on it, and Sentry offers no meaningful argument otherwise. The known subrogation rights exception further warrants denial of summary judgment on Lexington's equitable subrogation claim.

### Insured's Loss, Lexington's Damages And Justice Requires

Sentry contends that Lexington is unable to establish other equitable subrogation elements in that neither Bear Trucking nor Lexington suffered losses "such that any loss may be entirely shifted from Lexington to Sentry." Sentry notes that Bear Trucking agreed to pursue trial and appeal of the *Moran* action and released claims as to Sentry's handling of the *Moran* action. With the availability of excess insurance, Sentry grants Bear Trucking "to gamble on pursuing trial and an appeal" and "to count on its excess insurer to pay for any excess judgment."

"The crucial point is that the excess carrier has no legitimate expectation that the insured will 'give at least as much consideration to the financial well-being' of the insurance company as he does to his 'own interests' . . . in considering whether to settle for an amount below the excess policy coverage." *Commercial Union Assurance Companies v. Safeway Stores, Inc.*, 26 Cal.3d 912, 919, 164 Cal.Rptr. 709 (1980) (citation omitted). "In fact, the primary reason excess insurance is purchased is to provide an available pool of money in the event that the decision is made to take the gamble of litigating." *Commercial Union*, 26 Cal.3d at 919, 164 Cal.Rptr. 709 (holding an excess coverage policy "imposes no implied duty upon the insured to accept a settlement offer which would avoid exposing the insurer to liability.")

Sentry argues that Lexington was required by contract to pay all amounts "to settle or allegedly defend the *Moran* action in excess of Sentry Select's primary policy, through no fault of Sentry Select's" to eliminate Lexington's alleged losses and position equitably superior to that of Sentry.

Lexington responds that "payment *on behalf* of an insured is sufficient to support a subrogation

17

claim without showing that the insured has suffered a loss." Lexington contends that its payment in excess of Sentry's primary policy limits "gives Lexington the right to pursue Sentry for equitable subrogation, despite the fact that Bear Trucking did not pay first and then obtain reimbursement from Lexington." Lexington points to the following from *Northwestern Mut. Ins. Co. v. Farmers' Ins. Group*, 76 Cal.App.3d 1031, 1044-1045, 143 Cal.Rptr. 415 (1978):

> It is not a prerequisite to equitable subrogation that the subrogor suffered actual loss; it is required only that he would have suffered loss had the subrogee not discharged the liability or paid the loss. Thus it is that *Continental Cas. Co. v. Zurich Ins. Co., supra.*, 57 Cal.2d at pages 35-38, *Aetna Cas. & Surety Co. v. Certain Underwriters, supra.*, 56 Cal.App.3d at page 801, *Valentine v. Aetna Ins. Co., supra.*, 564 F.2d at page 296-297, and *Peter v. Travelers Insurance Company, supra.*, 375 F.Supp. at pages 1349-1350, all permitted recovery by one insurance carrier against another on a theory of equitable subrogation without any showing that the insured had suffered any loss.

*See Troost v. Estate of Deboer*, 155 Cal.App.3d 289, 294, 202 Cal.Rptr. 47 (1984) ("Payment by the insurance company does not change the fact a loss has occurred."); *Smith v. Parks Manor*, 197 Cal.App.3d 872, 878-879, 243 Cal.Rptr. 256 (1987) ("The creation of the obligation by execution of the settlement agreement was in itself a sufficient loss to give rise to a mature right of subrogation.")

Lexington is correct that its payment in excess of Sentry's primary policy limits entitles Lexington to pursue an equitable subrogation claim against Sentry. Sentry offers no meaningful opposition on this point. Based on the judgment in the *Moran* action, Bear Trucking and Mr. Knieling would have suffered a loss had Lexington not contributed to settlement amounts more than Sentry's limits. Sentry fails to negate the loss element of Lexington's equitable subrogation claim.

### *Primary Insurer Duties*

Lexington notes that a primary insurer owes its insured a duty a accept reasonable settlements within policy limits and that such duty extends to an excess carrier by subrogation in that the implied covenant of good faith and fair dealing obligates a primary insurer "in both contract and tort, to accept a reasonable settlement offer on behalf of its insured." *Camelot by the Bay Condominium Owners' Ass'n v. Scottsdale Ins. Co.*, 27 Cal.App.4th 33, 45, 32 Cal.Rptr.2d 354 (1994). In *Commercial Union Assurance Companies v. Safeway Stores, Inc.*, 26 Cal.3d 912, 917-918, 164 Cal.Rptr. 709 (1980), the California Court of Appeal explained:

> It has been held in California and other jurisdictions that the excess carrier may maintain

an action against the primary carrier for [ ] [wrongful] refusal to settle within the latter's policy limits (*Northwestern Mut. Ins. Co. v. Farmer's Ins. Group* (1978) 76 Cal.App.3d 1031 [143 Cal.Rptr. 415]; *Valentine v. Aetna Ins. Co.*, 564 F.2d 292; *Estate of Penn v. Amalgamated General Agencies* (1977) 148 N.J. Super. 419 [372 A.2d 1124]). This rule, however, is based on the theory of equitable subrogation: Since the insured would have been able to recover from the primary carrier for a judgment in excess of policy limits caused by the carrier's wrongful refusal to settle, the excess carrier, who discharged the insured's liability as a result of this tort, stands in the shoes of the insured and should be permitted to assert all claims against the primary carrier which the insured himself could have asserted (*see Northwestern Mut. Ins. Co. v. Farmers' Ins. Group, supra*, 76 Cal.App.3d at pp. 1040, 1049-1050). Hence, the rule does not rest upon the finding of any separate duty owed to an excess insurance carrier.

"In considering whether it will settle a claim, the primary insurer may consider its own interests, but it must equally consider the interests of the insured, which become the interests of the excess insurer by subrogation." *Peter v. Travelers Ins. Co.*, 375 F.Supp. 1347, 1350 (C.D. Cal. 1974). The California Court of Appeal has explained a primary insurer's duties to an excess insurer:

The primary insurer accordingly owes a duty of good faith to the excess carrier which is identical to that owed to its insured. (*Commercial Union Assurance Companies v. Safeway Stores, Inc., supra*, 26 Cal.3d at pp. 917-918; *see Signal Companies, Inc. v. Harbor Ins. Co., supra*, 27 Cal.3d at p. 365.) It must consider in good faith the interests of the excess insurer equally with its own (*Continental Cas. Co. v. United States Fid. & Guar. Co., supra*, 516 F.Supp. at p. 387), and must conduct the defense of the litigation, including settlement negotiations, so as not to expose the excess insurer to unwarranted liabilities. (Knepper, Relationships Between Primary and Excess Carriers in Cases Where Judgment or Settlement Value Will Exhaust the Primary Coverage (1953) 20 Ins. Counsel J. 207 (hereafter Knepper); Lanzone, Resolving Conflicts Between Primary and Excess Insurers (1975) 635 Ins. L.J. 733 (hereafter Lanzone).) An excess insurer may therefore recover against the primary insurer when, for example, the latter wrongfully refuses to accept a settlement offer within primary policy limits, where, prior to trial, there was a substantial likelihood of recovery in excess of those limits.

*Diamond Heights Homeowners Ass'n v. Nat'l American Ins. Co.*, 227 Cal.App.3d 563, 579, 277 Cal.Rptr. 906 (1991).

In *Northwestern Mut. Ins. Co. v. Farmer's Ins. Group*, 76 Cal.App.3d 1031, 1049-1050, 143 Cal.Rptr. 415 (1978), the California Court of Appeal further addressed an excess carrier's recoverable damages:

It is settled that recoverable damages for the failure of an insurer to effect reasonable settlement within its policy limits includes the entire amount of the insured's liability to the injured claimant, even though that amount be in excess of the insurer's policy limits. (*Comunale v. Traders & General Ins. Co. supra.*, 50 Cal.2d at pp. 658-661; *accord: Murphy v. Allstate Ins. Co. supra.*, 17 Cal.3d at p. 941; *Johansen v. California State Auto. Assn. Inter-Ins. Bureau, supra.*, 15 Cal.3d at p. 15; *Cain v. State Farm Mut. Auto. Ins. Co.*, 47 Cal.App.3d 783, 791 [121 Cal.Rptr. 200].) And we entertain no doubt

1    that an excess insurer which has settled and discharged the insured's liability may recover
     from the primary insurer an amount in excess of the primary insurer's policy limits if the
2    excess insurer can prove the primary insurer's unreasonable refusal to settle within its
     policy limits resulted in loss to the excess insurer in an amount in excess of the policy
3    limits of the primary insurer it would not otherwise have had.

4    Lexington correctly notes that the *Moran* action judgment exceed Sentry's primary policy limits

5    to require Lexington to contribute to post-judgment settlement under a reservation of rights.  Lexington

6    raises significant issues as to Sentry's primary insurer duties and whether it could have settled the *Moran*

7    action within policy limits and far short of the verdict.  In turn, Lexington has raised sufficient factual

8    issues whether justice requires Lexington to absorb all amounts it paid and whether Sentry has a superior

9    equitable position over Lexington given Sentry's failure to achieve a pre-judgment settlement.  In other

10   words, factual issues exist whether at least a portion of the loss paid by Lexington should be shifted to

11   Sentry.   In short, Sentry fails to negate elements of Lexington's equitable subrogation claim or

12   demonstrate that Lexington lacks evidence to support elements of its equitable subrogation claim.

13                                          **Equitable Indemnity**

14   Sentry argues that Lexington, an excess insurer, is unable to pursue equitable indemnity against

15   Sentry, a primary insurer, in that an excess insurer is limited to equitable subrogation.  Sentry contends

16   that "Lexington is not entitled to equitable indemnity, as a matter of law, because the parties do not cover

17   the same risk level."

18   A fellow district court has explained that when multiple insurers cover "the same event, their

19   reciprocal rights and duties do not arise out of contract because their agreements are not with each other.

20   . . . Their respective obligations flow instead from equitable principles."  *Fireman's Fund Ins. Co. v.*

21   *Commerce and Industry Ins. Co.*, 2000 WL 1721080, *2 (N.D. Cal. 2000).

22   Sentry notes that courts have equated equitable contribution with indemnity to render applicable

23   here the distinct principles of contribution and subrogation.  In *Fireman's Fund*, 65 Cal.App.4th at 1293,

24   77 Cal.Rptr.2d 296, the California Court of Appeal explained that "[e]quitable contribution is entirely

25   different" from subrogation:

26        It is the right to recover, not from the party primarily liable for the loss, but from a
          co-obligor who shares such liability with the party seeking contribution. In the insurance
27        context, the right to contribution arises when several insurers are obligated to indemnify
          or defend the same loss or claim, and one insurer has paid more than its share of the loss
28        or defended the action without any participation by the others. Where multiple insurance

                                               20

carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured. Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others.  (Italics in original.)

The California Court of Appeal pointed out that unlike subrogation, the "right of equitable contribution belongs to each insurer individually":

. . . the reciprocal contribution rights of coinsurers who insure the same risk are based on the equitable principle that the burden of indemnifying or defending the insured with whom each has independently contracted should be borne by all the insurance carriers together, with the loss equitably distributed among those who share liability for it in direct ratio to the proportion each insurer's coverage bears to the total coverage provided by all the insurance polices.

*Fireman's Fund*, 65 Cal.App.4th at 1294, 77 Cal.Rptr.2d 296.

Turning to insurers of different levels, the California Court of Appeal further explained that "equitable contribution is only available where coinsurers share the *same primary* level of liability on the same risk.  Consequently, in the absence of an express agreement to the contrary, there is *never* any right to contribution between primary and excess carriers of the same insured."  *Fireman's Fund*, 65 Cal.App.4th at 1300, 77 Cal.Rptr.2d 296 (italics in original).  As such, courts have limited an excess insurer's remedy against a primary insurer to subrogation.  "California cases which have upheld an excess insurer's right to sue a primary insurer have concluded such right devolves by subrogation to the insured's rights against the primary carrier, rather than by reason of some independent duty."  *Fireman's Fund 1994*, 21 Cal.App.4th at 1600.  "[P]rimary and excess insurers must seek reimbursement from one another through equitable subrogation rather than through a direct cause of action."  *Fireman's Fund*, 2000 WL 1721080, at *5.

Sentry equates the (second) equitable indemnity cause of action to equitable contribution, "a cause of action unavailable to insurers on different levels" in that "there is no contribution between a primary and an excess carrier."  *Reliance Nat'l Indem. Co. v. General Star Indem. Co.*, 72 Cal.App.4th 1063, 1078, 85 Cal.Rptr.2d 627 (1999) (using "contribution" and "indemnification" interchangeably).

21

1   Sentry concludes that Lexington's equitable indemnity claim fails "as a matter of law."

2        Lexington responds that Sentry "overlooks" that Lexington seeks to recover its payments of

3   $137,485.90 for prejudgment interest, $10,325.40 for the appeal bond premium, and $2,137.50 for

4   mediation costs.  Lexington characterizes such payments as "within the terms of Sentry's policy and for

5   which Lexington paid without having the actual obligation under the terms of its policy to do so."

6   Lexington notes that it sought these payments separately from its claim that "Sentry wrongfully failed

7   to settle."  Lexington concludes that since it paid amounts covered by Sentry's, not Lexington's, policy,

8   Lexington "may seek to recover these amounts from Sentry, notwithstanding the fact that Lexington is

9   an excess insurer."

10       "Indemnity is defined as the obligation resting on one person to make good any loss or damage

11  another has incurred.  While generally it rests on contract, it may also arise by implication as the result

12  of equitable considerations . . ." *Sammer v. Ball*, 12 Cal.App.3d 607, 610, 91 Cal.Rptr. 121 (1970).  An

13  "insurer may settle a claim against its insured without prejudice to its right to seek equitable indemnity

14  from other insurers potentially liable on the same risk on the ground that, although the settling insurer's

15  policy does not provide coverage, there is coverage under the other policies." *Mitchell, Silberberg &*

16  *Knupp v. Yosemite Ins. Co.*, 58 Cal.App.4th 389, 394, 67 Cal.Rptr.2d 906 (1997).

17       Lexington further contends that Sentry "confuses the distinction between equitable indemnity

18  and equitable contribution."  Contribution is an action "to enforce the right of contribution upon an

19  implied contract of each to the other, that they will share the burden equally." *Pacific Freight Lines v.*

20  *Pioneer Express Co.,* 39 Cal.App.2d 609, 614, 103 P.2d 1056 (1940).  "There can be no dispute as to

21  the rule that where two or more persons are jointly liable on an obligation and one of them makes

22  payment of the whole, that obligation is thereby extinguished, and the one paying has a new obligation

23  against the others for their proportion of what he paid for them." *Enscoe v. Fletcher*, 1 Cal. App. 659,

24  662, 82 Pac. 1075.  Equitable contribution "is based on the common sense notion that where two

25  indemnitors share equal contractual responsibility for a loss, the selection of which indemnitor is to bear

26  the loss should not be left to the sometimes arbitrary choice of the loss claimant. . . . More importantly,

27  the indemnitor should not be given the incentive to avoid paying a just claim in hopes that the claimant

28  will obtain payment from the coindemnitor." *California Food Service Corp. v. Great American Ins. Co.,*

1   130 Cal.App.3d 892, 901, 182 Cal.Rptr. 67 (1982).

2       Lexington explains that it and Sentry do not share a "common obligation" or "equal contractual

3   responsibility" for "the additional payments covered" under the Sentry policy and that Lexington is thus

4   "entitled to shift 100% of the liability which Lexington incurred for these amounts to Sentry under

5   principles of equitable indemnity."

6       Sentry fails to convince this Court that Lexington's equitable indemnity claim is barred as a

7   matter of law.  Sentry appears to transform Lexington's indemnity claim into a contribution claim.

8   Sentry and Lexington are not obligated to indemnify or defend the same loss or claim.  Lexington's

9   obligations arise in an excess, not primary, coverage context.  They insure different risks not subject to

10  equitable contribution.  Their burden is not a common one shared pro rata or as coinsurers.  Lexington

11  seeks to invoke equitable indemnity from Sentry for a risk not covered by the Lexington policy.

12  Lexington properly seeks by equitable indemnity amounts which it claims exceed its obligation.

13                               **Declaratory Relief**

14      Sentry concludes that the (third) declaratory relief cause of action is doomed with failure of the

15  equitable subrogation equitable indemnity claims.  Since the equitable subrogation and equitable

16  indemnity claims remain, so does Lexington's declaratory relief claim.

17                          **CONCLUSION AND ORDER**

18  _____For the reasons discussed above, this Court DENIES Sentry summary judgment and DENIES

19  as moot Lexington's F.R.Civ.P. 56(f) request.

20      This Court ORDERS Sentry's counsel, no later than June 12, 2009, to file papers to show cause

21  why this Court should not sanction counsel for disobedience of this Court's standing order to limit reply

22  briefs to 10 pages.  This Court ADMONISHES counsel that this Court expects all counsel to comply

23  with the standing order, Local Rules, and the Federal Rules of Civil Procedure.  These are mandatory

24  rules, not mere invitations.

25

26   IT IS SO ORDERED.

27  **Dated:    June 5, 2009**          _____/s/ Lawrence J. O'Neill_____
                                         UNITED STATES DISTRICT JUDGE
28